IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
December 15, 2020 Session

## STATE OF TENNESSEE v. RONNIE LUCAS WILSON

**Appeal from the Criminal Court for Knox County**
**No. 112976    Bobby R. McGee, Judge**

_____

### No. E2019-01864-CCA-R3-CD

_____

The Defendant, Ronnie Lucas Wilson, was convicted by a Knox County Criminal Court jury of four counts of being a felon in possession of a firearm; attempted first degree murder; two counts of employing a firearm with the intent to go armed during the commission of a dangerous felony; driving while the privilege to do so was canceled, suspended, or revoked; evading arrest in a motor vehicle and creating a risk of death or injury; two counts of initiating or making a false report to a law enforcement officer; and employing a firearm by a convicted felon during the commission of a dangerous felony. *See* T.C.A. §§ 39-17-1307(b)(1) (Supp. 2017) (subsequently amended) (firearm possession by a convicted felon), 39-13-202 (2018) (subsequently amended) (first degree murder), 39-12-101 (2018) (criminal attempt), 39-17-1324(b) (2018) (subsequently amended) (employing a firearm during the commission of a dangerous felony), 55-50-504(a)(1) (2017) driving while privilege canceled, suspended, or revoked), 39-16-603(b)(1), (b)(3)(B) (2018) (evading arrest); 39-16-502 (2018) (a)(1), (a)(2) (false report).  The jury found that the Defendant was a member of a criminal gang, and the trial court enhanced his sentences for being a felon in possession of a firearm and attempted first degree murder, which qualified as Criminal Gang Offenses pursuant to Tennessee Code Annotated section 40-35-121.  The court merged the convictions for being a felon in possession of a firearm into a single count, merged the convictions for employing a firearm into a single count, and merged the convictions for initiating or making a false report into a single count.  The court imposed an effective fifty-eight-year sentence.  On appeal, the Defendant contends that (1) the evidence is insufficient to support his conviction for attempted first degree murder and the criminal gang enhanced verdicts, (2) the gang enhancement counts violate the Defendant's constitutional rights to due process and expressive association, (3) the court erred in denying his motion to continue after severing the codefendant's case on the morning of the trial, and (4) he is entitled to a new trial on the basis of cumulative trial error.  We affirm the Defendant's convictions, but we vacate the jury's findings regarding the Criminal Gang Offenses Statute, and we modify the Defendant's sentences for being a felon in possession of a firearm and remand for entry of corrected judgments for attempted first degree murder and being a felon in possession of a firearm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed in Part, Modified in Part; Case Remanded**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and NORMA MCGEE OGLE, JJ., joined.

Gerald L. Gulley, Jr., Knoxville, Tennessee, for the Appellant, Ronnie Lucas Wilson.

Herbert H. Slatery III, Attorney General and Reporter; Edwin Alan Groves, Jr., Assistant Attorney General; Charme P. Allen, District Attorney General; Ta Kisha Fitzgerald and Phillip Morton, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

The Defendant's convictions relate to an incident in which he drove his car away from a police officer in a high-speed chase, fired a shotgun at the police car that was following him, and shot the officer after the Defendant lost control of his car, which left the road. The Defendant fled in his damaged car; lost control again, causing his car to become stuck in mud; and falsely reported that his car had been stolen. The Defendant was accompanied by Kristin King and Graham Sharp during the relevant events. Ms. King was indicted jointly with the Defendant for three facilitation offenses related to the Defendant's conduct. Mr. Sharp was not indicted with the Defendant and Ms. King. Shortly before the trial, the defense filed a motion for severance, which the trial court granted on the morning of the trial. Thus, the Defendant was not tried with Ms. King.

Due to the nature of the charges, the Defendant's trial was a trifurcated proceeding. In the first phase, Dan Ray testified that he was driving near Greenway Drive and Tazewell Pike on January 11, 2018, when he saw a police car with activated blue lights but no siren following a 1970s-era Chevy Nova. He said that the cars passed him and that he heard two gunshots. He said his view of the cars was obstructed at this point. He said he returned to the area and spoke with police officers.

Graham Sharp testified that he knew the Defendant on January 11, 2018. Mr. Sharp said he also knew Ms. King but did not know her well. Mr. Sharp said he met the Defendant and Ms. King, who were in the Defendant's car, at Party City. Mr. Sharp said that the Defendant drove, that Ms. King sat in the front passenger seat, and that Mr. Sharp got into the back of the car, which did not have a backseat, and sat on a milk crate. Mr. Sharp said that they had gone to purchase heroin and that he used the heroin after purchasing it.

Mr. Sharp testified that on the way back to Party City, a police car flashed blue lights on them on Whittle Springs Road, that the Defendant did not stop, and that the

Defendant told him to "get down in the backseat." Mr. Sharp said that at some point, the car stopped and that the Defendant fired a shotgun. Mr. Sharp said he "was stuck down" and did not see if the Defendant fired the shotgun from inside or outside the car. Mr. Sharp said that a car window shattered and that glass fell on him. He said that when he got up and looked out, they were on Tazewell Pike, that the Defendant stopped, and that Mr. Sharp got out of the car in front of a church. Mr. Sharp said that he walked a couple of blocks and that his mother arrived and picked him up. Mr. Sharp identified photographs of himself, the church, the interior of the Defendant's car, and the car's broken window. The photographs were received as exhibits.

Brian Breeden testified that he lived on Tazewell Pike and that cars frequently became stuck due to a wet area in front of his house. He said that on January 11, 2018, he heard a car's engine revving and that he knew a car was stuck. He said a young woman came to his door and asked for help with the stuck car. He said he noticed the stuck car had a side window missing. He said that he took his Jeep to the car and that he had the Defendant hook the car to the Jeep. Mr. Breeden said that he pulled out the car and that the driver drove away before Mr. Breeden could get out of the Jeep. Mr. Breeden described the driver as "fidgety, wanting out," and smelling of alcohol. Mr. Breeden said he saw two people: the male driver and the female passenger.

Mr. Breeden testified that he went inside, saw on Facebook that a police officer had been shot on Washington Pike, and told his son that the driver of the car that had been stuck might have been involved in the shooting. Mr. Breeden said his son found a photograph of "the car," which Mr. Breeden recognized as the one that had been stuck, and that he notified the police. He identified the Defendant as the person who had driven the car on January 11, 2018. Mr. Breeden identified photographs of the car the Defendant had driven, and the photographs were received as exhibits.

Mr. Breeden testified that he had been home and had seen the police retrieve a firearm from church property near his house on "Saturday."[1] He said that on the night of January 11, 2018, he had not seen anyone in the area where the firearm had been recovered. Mr. Breeden said his house was about nine miles from Target on Washington Pike.

Melissa Breeden testified that she lived on Tazewell Pike next to a church. She said that on January 11, 2018, she heard a car's engine revving and saw a "black Nova" in a ditch between two driveways. She said cars became stuck in this location frequently. She said a woman came to the door and asked for help extricating the car. Ms. Breeden agreed that the woman stated she and the car's driver were in a hurry, that they went the wrong direction, and that they became stuck in mud. Ms. Breeden said that she saw a man

---

[1] Other evidence showed that January 11, 2018, was Thursday.

walking around behind the car and that no one sat inside the car. Ms. Breeden said that while her husband prepared to go outside to help with the car, she saw the man sit on a curb next to the church's parking lot. She said that as soon as her husband pulled out the car with his Jeep, the car's driver jumped out of the car, unhooked the chain, and drove away. She said her husband mentioned that the glass had been missing on the car's side. She said that her son mentioned that a police officer had been shot near Target, that her husband had a "bad feeling," and that she and her husband recognized the car in a photograph their son found on the Internet as the car with which her husband had just helped. She identified photographs of the car she saw at the bottom of the driveway, and the photographs were received as exhibits. She said they called 9-1-1 to report that the car had been stuck in their driveway.

Ms. Breeden testified that on the following Saturday, she saw flashing lights outside and police officers pointing at something in the ditch. She did not see the officers pick up anything.

Knoxville Police Department (KPD) Officer James Williams, the victim of the shooting in this case, testified that he was on patrol on January 11, 2018, when he saw a speeding car on Whittle Springs Road. He said he followed the car, eventually losing sight of it. He drove onto Interstate 640 to look for the car and saw it ahead of him. He said the car exited the interstate, that he followed, that he turned on his car's blue lights while he was directly behind the speeding car on the exit ramp, and that the speeding car did not stop. Officer Williams said the speeding car went through a red light near Target, that he continued to follow the car, and that he heard two shotgun blasts. He said that he saw shotgun wadding fly past the driver's side window of his car and that he notified dispatch about the shots fired. He thought one of the rounds hit his driver's side mirror because his mirror was folded back and part of the spotlight housing was missing.

Officer Williams testified that as the speeding car approached Washington Pike and Greenway, he thought the speeding car would hydroplane, and he slowed his police car. Officer Williams said the speeding car "spun out" and stopped in a grassy area. Officer Williams said he got out of his car, stood by his front driver's side tire using his car as a buffer between himself and the car he had pursued, drew his handgun with his right hand, and held his radio in his left hand. He agreed that he pointed his handgun at the car he had been pursuing. He said his blue lights were still activated. He said that he was twenty to twenty-five feet from the other car and that he saw two people in the car: a man in the driver's seat with short, dark hair and a neck tattoo and a woman in the front passenger seat with long hair. He said the woman screamed but that he could not understand what she said. He said the driver "was attempting to do something with something" between the two front seats. He said he "gave a verbal command to stop." He said he heard a shotgun blast and felt something hit his left arm near the shoulder joint, which he said was painful. He said the shot came from the man in the driver's seat. Officer Williams said the man

-4-

fired four additional shots after hitting him. Officer Williams agreed that at least one round hit the front of his patrol car. Officer Williams said he notified dispatch that he had been shot and that he began to feel ill. He said a woman, who identified herself as a nurse, approached him and applied a tourniquet from his first aid kit.

Officer Williams testified that his police car was equipped with a video recording system, which he activated during his pursuit of the speeding car. The recording was played for the jury and received as an exhibit. The recording was consistent with Officer Williams' testimony regarding the pursuit and shooting.

Officer Williams testified that he was taken to a hospital. He said the shotgun blast penetrated his muscle and impacted his humerus bone, causing a depression fracture. He said he saw an orthopedist and attended physical therapy for six to seven months. He said he had been unable to lift his injured arm for two to three days and that for several months, he had a restricted range of motion and an inability to lift anything heavier than ten pounds. He said he was on medical leave for about one month. He said he had returned to work but that he still did not have full recovery of strength and range of motion, which limited his abilities.

Officer Williams identified the Defendant as the person who shot him and said he had no question about the identification.

Officer Williams testified that the driver's side rear quarter window was broken on the car he had pursued. In his opinion, the initial shotgun blast fired when the car was moving had broken the window based upon the shot's having come "from outside next to the body of the car . . . pointed backwards while he was shooting."

KPD Officer Todd Childress testified that on January 12, 2018, he went to the location where the car used in the chase and shooting had been found. He estimated the car was found one to one and one-half miles from the location of the shooting. He identified photographs of the car at this location, and the photographs were received as exhibits. The photographs depicted the car under a railroad trestle.

Retired KPD Lieutenant Vincent Ayub testified that in January 2018, he was the forensic unit supervisor. He said that on January 13, he went to a location where other officers had found a shotgun under a sheet of ice in a ditch beside a road. He identified photographs of the shotgun and some shell casings also found at this location, which were received as exhibits. He said that one spent casing was inside the shotgun and that two spent casings and one live round were outside the shotgun. He described the casings as "double aught, Winchester 2.75" casings. He identified the shotgun as a "typical pump shotgun," which was received as an exhibit. He explained that it had to be loaded with ammunition, "rack[ed] . . . back and forth," and the safety disengaged before firing. He

said that after the shotgun's trigger was pulled, the user would rack the grip back and forward to eject the spent round and chamber the next round. He said the shotgun held at least four and possibly seven rounds.

KPD Crime Scene Investigator Jacklyn Walkup testified that she and other officers took photographs and made measurements at the location where the victim was shot and another location "at North Mall, Washington Pike, in front of Kohl's," which other evidence showed was the area where the Defendant first lost control of the car. Ms. Walkup identified photographs of both locations, twelve-gauge shotgun shells, shotgun wadding, shotgun pellet damage to the victim's patrol car, the victim's duty belt, and bloodstains. The photographs were received as exhibits. Ms. Walkup identified a Winchester twelve-gauge live round and Winchester spent shell casings collected by retired Lieutenant Ayub, and the items were received as exhibits.

Ms. Walkup testified that she went to the hospital where the victim had been taken and photographed the victim's injuries, collected the pellet that had penetrated his arm, and collected his uniform and other clothing as evidence. She said she also processed the Chevy Nova for latent fingerprints, DNA, and other evidence. She said she collected a white blanket and a Walmart receipt.

Knox County 9-1-1 records custodian Michael Mays identified a recording of a call received at 8:39 p.m. on January 11, 2018. The recording was received as an exhibit and played for the jury. In the recording, a man reported that his black Chevy Nova was stolen from a gas station near East Town Mall thirty minutes to one hour earlier. He said three men stole the car. The man claimed to be with friends. In response to the man's agitation, the 9-1-1 operator asked why he was "still freaking out" if the car was stolen thirty minutes to one hour ago. The man claimed he had not called sooner because he had not been in possession of his cell phone. The man said he could not meet officers about the car theft because he had outstanding warrants. The man said he could talk to detectives he knew because he worked for the Sheriff's Department "helping them out." He then said he did not work for the Sheriff's Department. The operator asked the man whether he wanted to report his car as stolen, and the man said he would call back and hung up.

Knox County Sheriff's Deputy Brad Yearout testified that he was familiar with the Defendant's voice. After a portion of the 9-1-1 recording was played, Deputy Yearout said he recognized the voice as the Defendant's. Deputy Yearout testified that the Defendant called him after the 9-1-1 call and told him that his car had been stolen. Deputy Yearout described the Defendant as "keyed-up and amped-up." Deputy Yearout said he had known before the Defendant's call that an officer had been shot. Deputy Yearout said he was able to "put two and two together" because the car that the Defendant "had been driving" matched the description of the vehicle the shooting suspect had driven. Deputy Yearout acknowledged that the Defendant had not stated he had been driving the car. Deputy

Yearout identified the Defendant in the courtroom and said the Defendant had worked as a confidential informant about a year before the shooting.

KPD Investigator Clayton Madison testified that he responded to the scene after the victim had been taken to the hospital. Investigator Madison said he spoke with witnesses and observed the crime scene technicians processing the scene for evidence. He said the officers retrieved the video from the victim's patrol car and reviewed it as part of the investigation. Investigator Madison said Investigator Washam had shown the victim a photograph lineup; that the victim identified two potential suspects, one of whom was the Defendant; and that Investigator Madison was aware of the Defendant's calls to 9-1-1 and Deputy Yearout. Based upon this information, Investigator Madison obtained arrest warrants for the Defendant.

Investigator Madison testified that he attempted unsuccessfully to locate the Defendant using a cell phone "ping" but that the cell phone was turned off. Investigator Madison said the investigators contacted the Defendant's family members and Kristin King's family members. Investigator Madison said Mr. Sharp was interviewed after the investigators identified Mr. Sharp as a person who might have been with the Defendant during the incident.

Investigator Madison testified that he learned around 3:30 a.m. on January 12, 2018, that the Defendant had been arrested. Investigator Madison said that after receiving this information, he interviewed Ms. King at the police department and obtained a search warrant for the Defendant's car.

Investigator Madison identified a Walmart receipt recovered in the search of the Defendant's car, and the receipt was received as an exhibit. He said the receipt was dated January 11, 2018 at 18:56. He said the Walmart location identified on the receipt was about two miles from the intersection of Washington Pike and Tazewell Pike.

The following stipulation of fact was read to the jury:

On January 11th, 2018, the [Defendant's] privilege to drive a motor vehicle was in a revoked status and had been revoked by the Tennessee Department of Safety prior to January 11th, 2018.

A second stipulation of fact was read to the jury:

(1) [O]n January 11th, 2018, the [Defendant] had a prior felony conviction involving violence.

(2) [O]n January 11th, 2018, the [Defendant] had a prior felony conviction involving force.

(3) [O]n January 11th, 2018, the [Defendant] had a prior felony conviction involving the use of a deadly weapon.

(4) [O]n January 11th, 2018, the [Defendant] had a prior felony drug conviction.

The Defendant elected not to present evidence. After receiving the proof, the jury found the Defendant guilty of four counts of unlawful possession of a weapon, not guilty of attempted first degree murder with serious bodily injury but guilty of the lesser included offense of attempted first degree murder, guilty of employing a firearm during the commission of a dangerous felony, guilty of violation of the driver's license law, guilty of evading arrest with a risk of death or serious bodily injury, guilty of making a false police report, and guilty of initiating a false police report.

In the second phase of the trial, the Defendant faced two charges of employing a firearm as a convicted felon during a dangerous felony. The State relied upon two prior convictions: a May 16, 2011 aggravated burglary conviction and a February 1, 2017 sale of a Schedule II controlled substance conviction.

Knox County Criminal Court Records Custodian Stephanie Ogle identified the judgment for the Defendant's aggravated burglary conviction, and the judgment was received as an exhibit. The State offered a certified copy of the Defendant's Claiborne County information and judgment for sale of methamphetamine, and the information and judgment were received as an exhibit.

The Defendant did not offer proof in the second phase. After receiving the evidence, the jury found the Defendant guilty of two counts of employment of a firearm by a convicted felon during a dangerous felony.

In the third phase of the trial, the Defendant was charged, in Counts 15 and 16, pursuant to the Criminal Gang Offenses Statute, which enhances the sentence for certain convictions, related to the following guilty verdicts returned in the first phase of the trial:

Count 1 – being in possession of a firearm after having been convicted of a violent felony

Count 2 – being in possession of a firearm after having been convicted of a felony involving the use of force

-8-

Count 3 – being in possession of a firearm after having been convicted of a felony involving the use of a deadly weapon

Count 4 – being in possession of a firearm after having been convicted of a felony drug offense

Count 5- attempted first degree murder

The indictment specified that the Defendant was a member of the Aryan Nation criminal gang. The indictment also specified a pattern of criminal gang activities committed within five years of each other by members of the Aryan Nation. The State offered evidence of seven prior convictions committed by four members of the Aryan Nation.

Knox County Sheriff's Gang Intelligence Unit Detective Thomas Walker, an expert in gang identification, gang member identification, and gang activities, testified that a gang was defined in the State of Tennessee as three or more people who (1) are part of an organized or unorganized group with a primary activity being the commission of criminal acts, (2) have a name, identifying color, sign, or symbol, and (3) meet on a regular basis to communicate. He said, "The main issue is that they commit crimes as a group." He said that to identify an individual as a gang member, the State definition must be met, that the individual must meet two enhancement factors, and that they must attain a rating of ten or more on a points system.

Detective Walker testified that the Aryan Nation was a criminal gang, and he described its history, which he said was based on white supremacy beliefs. He said Aryan Nation members had distinctive tattoos to mark themselves as members of the gang. He described the hierarchy of the Aryan Nation and the expectations of its members. He said the individuals upon whose convictions the State relied to show gang activity previously had been confined in the Knox County Jail and had been identified by the Knox County Sheriff's Department as members of the Aryan Nation gang. Detective Walker said the Defendant had been previously identified as a member of the Aryan Nation gang in conjunction with the Defendant's confinement in the Knox County Jail in 2014. Detective Walker said the Defendant had acknowledged Aryan Nation membership in a classification interview. Detective Walker said the Defendant had also been identified as an Aryan Nation gang member by the Tennessee Department of Correction in 2013. Detective Walker said the Defendant had an Aryan Nation patch tattooed on his abdomen, had been arrested for a violent crime, and had a felony criminal history. Detective Walker said the Defendant's score was 37 on the rating system used to identify gang members. Detective Walker identified photographs of the Defendant's tattoos and explained their meanings in terms of the Aryan Nation gang, and the photographs were received as exhibits. One of the photographs was taken on the date in 2018 when the Defendant was taken into custody in the present case, and the other was taken in 2014. Detective Walker said the Defendant

had been involved in several physical altercations with black inmates during the Defendant's confinement in the Knox County Jail. Detective Walker acknowledged that he had no direct information that the Defendant's actions in the present case were for the specific benefit of the Aryan Nation gang.

Detective Walker testified that criminal gangs generally, and the Aryan Nation gang specifically, relied upon having a reputation for violence. He said that violence by members of the Aryan Nation was a benefit to the gang overall because it enhanced the gang's reputation for violence. He said that within the prison system, Aryan Nation gang members attacked inmates of ethnic minorities or correctional employees in order to maintain a violent reputation and to intimidate correctional employees.

Detective Walker testified that in his opinion, the benefit to the Defendant in fleeing from and shooting at the victim in this case was that the Defendant knew he was a gang member, would return to prison because he had a prior felony record, and had a weapon in the car he was prohibited from possessing. Detective Walker said that if the Defendant had been successful in escaping after shooting at the victim seven times and attempting to kill the victim, the Aryan Nation's reputation as a violent gang would be enhanced and the Defendant "probably [would receive] a promotion to enforcer."

Detective Walker agreed that although most Aryan Nation gang members joined while in prison, some joined outside of prison. He agreed that a person might join the Aryan Nation gang for personal protection. He agreed that members who left prison were expected to contribute financially to "prison accounts" and legal defense funds for members. He agreed that the Aryan Nation gang had rules, that they maintained a membership list, and that a person might be removed as a member for violating the rules. He "assum[ed]" that a person might withdraw membership from the Aryan Nation gang after leaving prison but said that due to the high rate of recidivism, most people returned to prison and would be in danger if they were no longer an Aryan Nation gang member. He said that if a person left the Aryan Nation gang, members of the gang would physically remove the person's gang tattoo from the person's body. He said that the Department of Correction offered gang membership renunciation classes and that the Defendant had not participated in them during his prior incarceration.

Detective Walker identified a 2014 photograph from the Defendant's Facebook account and described it as depicting the Defendant and other Department of Correction inmates in a prison cell displaying an Aryan Nation gang sign with their hands. The photograph was received as an exhibit.

The Defendant testified that he was incarcerated in 2011 for an aggravated burglary conviction, that he was released after completing a boot camp program, and that he returned to prison for two years following a probation violation for failing a drug screen. He said

that while he was incarcerated in 2013, he approached Aryan Nation members after seeing "some of the things they were doing" because he thought they needed "help" and "refining." He said the Aryan Nation was not about hate and that he had thought he could "bring a little bit of integrity to it." He said the Aryan Nation was "supposed to be the people that the white race is going to look up to." He said the organization was founded upon Christianity, not hate, the latter of which he ascribed to the Ku Klux Klan. He said the organization was about separation of the races but not about a belief that one race was better than another. He said he would not force his views on another person, including his adolescent daughter, who might "come home with" a person of another race.

The Defendant testified that he received his Aryan Nation patch tattoo in 2014, after being a probationary member of the group for a year. He agreed he left prison in 2015. He said that he had "previously been" a member of the Aryan Nation but that a member could withdraw. He said he "lived it for a few years in prison and for a period of time outside." He said he left the gang because he did not follow rules well. He said some other Aryan Nation members "came home with some opinions, some views, some orders that were just beyond [him]" and that he was not going to follow. He said he lived a productive life after he left prison and did not want to be part of the Aryan Nation. He said the Aryan Nation's members permitted him to leave the organization.

The Defendant testified that a person who withdrew from the Aryan Nation might be asked to cover the person's Aryan Nation tattoo. He said that with regard to specific incidents of violent tattoo removal Detective Walker had mentioned, the people referenced "probably were individuals who were running from the Aryan Nation, who probably have done something like rat on members or rat on another organization or something like that." The Defendant said that he intended to have his tattoo covered but had not yet had a chance to do so.

The Defendant testified that his actions on January 11, 2018, had not been at the direction of anyone in the Aryan Nation. He said no one from the Aryan Nation had ordered or had known about his actions. He said the two individuals with him at the time of the offenses were not members of the Aryan Nation.

The Defendant testified that he would have preferred to plead guilty to some of the charges. He claimed his attorney had not asked him if he wanted to plead guilty to some the offenses. The Defendant acknowledged that he had driven on a suspended license, that he had been a felon in possession of a firearm, and that he had driven the Chevy Nova in the video recording previously shown to the jury. He said, however, that he had not intended to kill the victim. The Defendant acknowledged that he had gone to purchase heroin on the day of the offenses and said he "was completely out of [his] head." He said he had used heroin and "crystal meth" that day. He acknowledged that he had fired the shotgun repeatedly, pumping it between shots, while he drove "a four-speed car" during

-11-

the pursuit. He said he had fired the gun at the victim's car's bumper "in an attempt to blow the radiator." The Defendant said he fled from the victim because the Defendant knew he was "high" and would probably return to jail for a long time. Addressing the victim, the Defendant apologized for his actions. The Defendant claimed he had not seen the victim standing next to the car when the Defendant fired shots after the Defendant's car slid off the road. The Defendant claimed he had not heard the victim's command to "stop" or the victim's saying "Aw" after being struck.

The Defendant acknowledged that he had been taken into the Knox County Jail on February 4, 2016. He did not recall telling Brett Worley during the classification process on that date that he was a member of the Aryan Nation and said he was "pretty sure" he had stated he was "inactive." The Defendant agreed that in 2018, he told classification officers that he was inactive with the Aryan Nation. He said that inactive meant the person was no longer a member. He said that if an inactive person wanted to became an active member, the person would have to go through the entire membership process again.

The Defendant denied that he told another inmate he was going to have the Aryan Nation kill the victim. He said the inmate had fabricated the story in order to seek favorable treatment for a second degree murder charge the inmate faced. The Defendant stated that his understanding of the inmate's allegation was that the inmate had claimed the Defendant wanted police officers who were also Aryan Nation members to kill the victim in order to prevent the victim from testifying against the Defendant.

The Defendant displayed his tattoos to the jury, which included the Aryan Nation patch, a swastika, and the words "White Pride World Wide." He said that a portion of the Aryan Nation patch would be covered with new tattoo ink due to his no longer being a member of the gang. The Defendant denied that a person who attempted to kill a police officer would receive a higher rank in the Aryan Nation gang.

After receiving the evidence, the jury found that the Defendant's commission of unlawful possession of a weapon and attempted first degree murder were criminal gang offenses. The jury found that the Defendant was a criminal gang member based upon the following two criteria:

> The Defendant "[r]esides in or frequents a particular criminal gang's area, adopts their style or dress, their use of hand signs or their tattoos and associates with known criminal gang members[.]"

> The Defendant "[i]s identified as a criminal gang member by physical evidence such as photographs or other documentation."

The jury found, as well, that at the time of committing unlawful possession of a weapon and attempted first degree murder, the Defendant was a criminal gang member based upon the same two criteria it found relative to its finding that he committed criminal gang offenses. Finally, the jury found that the unlawful possession of a weapon and attempted first degree murder offenses were committed at the direction of, in association with, or for the benefit of the Defendant's criminal gang or a member of the Defendant's criminal gang.

At a sentencing hearing, the trial court imposed an effective fifty-eight-year sentence. This appeal followed.

# I

## Sufficiency of the Evidence

### A. Attempted First Degree Murder

The Defendant contends that the evidence is insufficient to support his conviction for attempted first degree murder because the State failed to establish he acted with premeditation and intent to kill the victim. The State counters that the evidence is sufficient to show the Defendant acted with premeditation and intent. We agree with the State.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

First degree murder is the unlawful, intentional, and premeditated killing of another. T.C.A. §§ 39-13-201 (2018), 39-13-202(a)(1). In the context of first degree murder, intent is shown if the defendant has the conscious objective or desire to cause the victim's death.

*State v. Page*, 81 S.W.3d 781, 790-91 (Tenn. Crim. App. 2002); T.C.A. § 39-11-106(a)(18) (2019) (defining intentional as the "conscious objective or desire to engage in the conduct or cause the result"). A premeditated act is one which is

> done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

*Id.* § 39-13-202(d). The question of whether a defendant acted with premeditation is a question of fact for the jury to be determined from all of the circumstances surrounding the killing. *State v. Davidson*, 121 S.W.3d 600, 614 (Tenn. 2003). Proof of premeditation may be shown by direct or circumstantial evidence. *State v. Brown*, 836 S.W.2d 530, 541 (Tenn. 1992). As a result, the jury "may infer premeditation from the manner and circumstances of the killing." *State v. Jackson*, 173 S.W.3d 401, 408 (Tenn. 2005); *see State v. Vaughn*, 279 S.W.3d 584, 595 (Tenn. Crim. App. 2008). Factors from which a jury may infer premeditation include:

> [D]eclarations by the defendant of an intent to kill, evidence of procurement of a weapon, the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, infliction of multiple wounds, preparation before the killing for concealment of the crime, destruction or secretion of evidence of the murder, and calmness immediately after the killing.

*State v. Nichols*, 24 S.W.3d 297, 302 (Tenn. 2000).

A defendant commits criminal attempt when he acts "with the kind of culpability otherwise required for the offense . . . [and] [a]cts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part[.]" T.C.A. § 39-12-101(a)(2).

Viewed in the light most favorable to the State, the evidence shows that the Defendant fled in his car at high speeds from the police officer victim. After the victim displayed his patrol car's blue lights, the Defendant fired two shots from a pump-action shotgun, striking the victim's patrol car. The Defendant continued his flight until his car slid off the road, at which point the victim got out of his patrol car, saw the Defendant "attempting to do something with something" between the two front seats, and ordered the Defendant to stop. Instead, the Defendant fired a shotgun blast, striking the victim in the arm, and then fired four more shots before fleeing the scene in his car. Shortly thereafter,

-14-

the Defendant's car became stuck, and the shotgun with which he shot the victim was later recovered in a ditch near this location. The Defendant made a false report to 9-1-1 and to Deputy Yearout that his car had been stolen, from which a rational jury could conclude that the Defendant had attempted to conceal his involvement in the shooting. The jury could likewise conclude from the Defendant's firing repeated gunshots at the victim in two separate intervals during the incident that the Defendant had the opportunity to form the requisite intent to kill the victim after reflection and judgment. We note, as well, that the victim was struck during the second of these intervals and that the Defendant continued firing after striking the victim. In addition, the evidence showed that the Defendant had to pump the shotgun between each firing, providing him with time to reflect and form the intent to kill by continuing to shoot at the victim. Finally, a rational jury could conclude from the location in which the Defendant's car was recovered that the Defendant attempted to conceal the car after his crimes.

Upon review, we conclude that the evidence is sufficient to support the Defendant's attempted first degree murder conviction. He is not entitled to relief on this basis.

## B.     Criminal Gang Offenses Enhancement Verdicts

The Defendant contends that the evidence is insufficient to support the jury's verdicts relative to the Criminal Gang Offenses Statute. The State counters that the evidence is sufficient. We conclude that the evidence viewed in the light most favorable to the State fails to show beyond a reasonable doubt that the Defendant's convictions for attempted first degree murder and for being a felon in possession of a firearm were subject to the Criminal Gang Offenses Statute.

As relevant to this appeal, the Criminal Gang Offenses Statute provides

(a) As used in this section, unless the context otherwise requires:

(1) "Criminal gang" means a formal or informal ongoing organization, association or group consisting of three (3) or more persons that has:

(A) As one (1) of its primary activities, the commission of criminal gang offenses;

(B) Two (2) or more members who, individually or collectively, engage in or have engaged in a pattern of criminal gang activity;

(2) "Criminal gang member" is a person who is a member of a criminal gang, as defined in subdivision (a)(1), who meets two (2) or more of the following criteria:

. . . .

(D) Resides in or frequents a particular criminal gang's area, adopts their style or dress, their use of hand signs or their tattoos and associates with known criminal gang members;

. . . .

(G) Is identified as a criminal gang member by physical evidence such as photographs or other documentation;

(3) "Criminal gang offense" means:

. . . .

(B) The commission or attempted commission, facilitation of, solicitation of, or conspiracy to commit any of the following offenses on or after July 1, 2013:

(i)   First degree murder, as defined in § 39-13-202;

. . . .

(xxvi) Unlawful carrying or possession of a weapon, as defined in § 39-17-1307;

. . . .

(4)(A) "Pattern of criminal gang activity" means prior convictions for the commission or attempted commission of, facilitation of, solicitation of, or conspiracy to commit:

(i)   Two (2) or more criminal gang offenses that are classified as felonies; or

-16-

(ii)     Three (3) or more criminal gang offenses that are classified as misdemeanors; or

(iii)    One (1) or more criminal gang offenses that are classified as felonies and two (2) or more criminal gang offenses that are classified as misdemeanors; and

(iv)    The criminal gang offenses are committed on separate occasions; and

(v)     The criminal gang offenses are committed within a five-year period;

(B)(i) As used in this subsection (a), "prior conviction" means a criminal gang offense for which a criminal gang member was convicted prior to the commission of the instant criminal gang offense by the defendant and includes convictions occurring prior to July 1, 1997;

(ii)    Convictions for multiple criminal gang offenses committed as part of a single course of conduct within twenty-four (24) hours are not committed on "separate occasions." However, acts that constitute criminal gang offenses under subdivision (a)(3)(A) shall not be construed to be a single course of conduct.

(b) A criminal gang offense committed by a defendant shall be punished one (1) classification higher than the classification established by the specific statute creating the offense committed if:

(1) The defendant was a criminal gang member at the time of the offense; and

(2) The criminal gang offense was committed at the direction of, in association with, or for the benefit of the defendant's criminal gang or a member of the defendant's criminal gang.

. . . .

(d) If the criminal gang offense subject to enhancement under subsection (b) . . . is a Class A felony, the presumptive sentence for the offense shall be the maximum sentence within the range from which the defendant is to be sentenced.

. . . .

(g) If the defendant is charged with a criminal gang offense and the district attorney general intends to seek enhancement of the punishment under subsection (b), . . . the indictment, in a separate count, shall specify, charge and give notice of the subsection under which enhancement is alleged applicable and of the required prior convictions constituting the gang's pattern of criminal gang activity.

(h)(1) If the defendant is convicted of the underlying criminal gang offense, the jury shall then separately consider whether the defendant was at the time of the offense:

   (A) A criminal gang member;

     . . . .

 (2) If the jury convicts the defendant under subdivision (h)(1)(A), . . . the court shall pronounce judgment and sentence the defendant as provided in this section.

T.C.A. § 40-35-121 (2018).

The jury convicted the Defendant of one count of attempted first degree murder and four counts of firearm possession offenses, all of which were subject to the Criminal Gang Offenses Statute enhancement. Three of the Defendant's four firearm offenses were Class B felonies, and one was a Class C felony. Based upon the jury's findings that the Defendant was a member of a criminal gang and that the firearm offenses were criminal gang offenses, his Class B felonies were enhanced to Class A, and his Class C felony was enhanced to Class B. The trial court merged the four firearm offense convictions into a single judgment. The attempted first degree murder conviction was a Class A felony. The Criminal Gang Offenses Statute provided for a presumptive maximum-within-the-range sentences for the Class A felonies and for other offenses subject to the criminal gang enhancement. *See id.* §§ 39-11-117(a)(2) (classifying attempted first degree murder as a Class A felony); 39-17-1307(b)(1)(A), (2) (classifying as a Class B felony the commission of an offense while being in possession of a firearm with a prior conviction of a felony crime of violence or

-18-

felony involving a deadly weapon), 39-17-1307(b)(1)(B), (3) (classifying as a Class C felony the commission of an offense while in possession of a firearm after being convicted of a felony drug offense), 40-35-121(b) (increasing by one the classification for a criminal gang offense conviction), 40-35-121(d) (providing for a presumptive sentence of the maximum within the range if the offense is a Class A felony or is subject to enhancement pursuant to section 40-35-121(b)), 40-35-112(b)(1) (setting the sentencing range for a Range II offender convicted of a Class A felony at twenty-five to forty years).

At the sentencing hearing, the trial court acknowledged the jury's findings relative to the Criminal Gang Offenses Statute and the presumptive forty-year sentences, the maximum sentence for a Class A felony for a Range II offender, for attempted first degree murder and for being a felon in possession of a firearm. The court went on to consider the enhancement and mitigating factors, finding that the Defendant was a "violent, dangerous offender" and had an "extensive" history of criminal convictions. *See id*. § 40-35-114(1) ("the defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range"). The court did not find the existence of any mitigating factors. The court weighed the enhancement factor heavily and set the sentences at forty years for the three Class A felony firearm convictions, forty years for the attempted first degree murder conviction, and twenty years for the Class B felony firearm convictions. As we have stated, the court merged the four firearm convictions into a single judgment.

With this backdrop, we consider the Defendant's issue regarding the sufficiency of the evidence as to the enhancement of these convictions pursuant to the Criminal Gang Offenses Statute. In that regard, he argues that the State failed to establish that the offenses were "committed at the direction of, in association with, or for the benefit of the defendant's criminal gang or a member of the defendant's criminal gang." *See id*. § 40-35-121(b)(2). The Defendant does not challenge the jury's finding pursuant to section 40-35-121(a)(2)(D) and (G) that he was a member of a criminal gang. The State argues that Deputy Walker's expert testimony sufficiently established the required nexus between the Defendant's crimes and the criminal gang of which the Defendant was a member at the time of the offenses.

Viewed in the light most favorable to the State, the evidence supporting a conclusion that the Defendant committed the crimes "at the direction of, in association with, or for the benefit of the defendant's criminal gang or a member of the defendant's criminal gang" consists of Deputy Walker's opinion testimony regarding the Aryan Nation's reliance on violence as a means of enhancing its reputation as a criminal gang. *See id*. In Deputy Walker's opinion, the Defendant's shooting at a police officer would enhance the Aryan Nation's reputation as a violent gang and might enhance the Defendant's standing within the gang. Deputy Walker acknowledged, however, that he had no specific information that these things had occurred or that the Defendant committed the crimes for the benefit of the

Aryan Nation. The Defendant testified that he was no longer associated with the Aryan Nation and had not committed the crimes on the orders of a member of or to benefit the Aryan Nation and that the individuals with him had not been Aryan Nation members. Although the verdict supports a conclusion that the jury found that the Defendant's testimony was not credible, a rational jury could not conclude that the remaining evidence supports a finding beyond a reasonable doubt that the Defendant actions were directed by, in association with, or for the benefit of the Aryan Nation. Deputy Walker's testimony involved generalities of the gang's operation, but neither his testimony nor the other evidence provided any specific factual evidence establishing a nexus between the Defendant's actions and the Aryan Nation. We acknowledge that circumstantial evidence may provide sufficient evidence of guilt beyond a reasonable doubt. In the present case, however, the circumstantial evidence fails to go beyond conjecture in establishing a nexus between the Defendant's actions and the Aryan Nation. We conclude, therefore, that the evidence is insufficient to support the jury's findings regarding the Criminal Gang Offenses Statute, and we vacate the jury's factual findings in Counts 15 and 16.

We turn, then, to the effect this insufficiency of evidence has on the trial court's sentencing determinations for the attempted first degree murder and firearm possession convictions. With regard to attempted first degree murder, it remains a Class A felony, notwithstanding the inapplicability of the Criminal Gang Offenses Statute. *See* T.C.A. § 39-11-117(a)(2). Three of the Defendant's convictions for being a felon in possession of a firearm were Class B felonies, enhanced to Class A, and now revert to Class B in the absence of the gang enhancement. The remaining conviction for being a felon in possession of a firearm was a Class C felony, enhanced to Class B, and now revert to Class C in the absence of the gang enhancement. We will further address the Defendant's sentences for these offenses in section V below.

## II

### Constitutionality of Criminal Gang Offenses Statute

The Defendant contends that the Criminal Gang Offenses Statute violates his constitutional rights to due process and expressive association. Because we have determined that the State presented insufficient evidence for the statute to be applied to the Defendant, consideration of this issue is not required for determination of the case. As a general principle, courts will not consider a constitutional issue unless resolution of the issue is required for determining the case and the rights of the parties. *See, e.g.*, *Watts v. Memphis Transit Management Co.*, 462 S.W.3d 495, 498 (Tenn. 1971); *Owens v. State*, 908 S.W.2d 923, 926 (Tenn. 1995). For this reason, we decline to consider the Defendant's constitutional challenge.

-20-

## III

## Denial of Motion to Continue

The Defendant contends that the trial court abused its discretion by failing to grant a continuance after granting his motion for a severance on the day of the trial. The State responds that the court did not err because the Defendant's motion requested a severance or, in the alternative, a continuance. We conclude that the court did not abuse its discretion.

The record reflects that the Defendant was indicted jointly with codefendant Kristin King, his female passenger, who was charged with facilitation of some of the Defendant's offenses. Five days before the trial, the Defendant filed a "Motion for Severance or, in the Alternative, for Continuance of Trial Setting." The defense alleged that, on the previous day, it had received an expert witness report of the codefendant's proposed domestic violence expert witness. The report, which was attached to the motion, stated that the expert would testify, in the context of explaining the codefendant's actions related to the offenses with which she was charged, about the Defendant's verbal and physical abuse of the codefendant, the Defendant's drug use, and the Defendant's membership in the Aryan Nation. The Defendant's motion alleged that, in light of the proposed expert testimony, a joint trial of the Defendant and the codefendant would be unfairly prejudicial to the Defendant and a violation of the Defendant's rights to due process and a fair trial. The Defendant requested a severance of his trial from the codefendant's trial, or, alternatively, a continuance in order to "investigate the possibility of countervailing expert proof or otherwise prepare to defend against the antagonistic defense" of the codefendant. The trial court heard the motion and granted the Defendant's motion for a severance on the morning of the trial. Defense counsel asked at the hearing for a severance and, in the alternative, for a continuance to prepare for a trial in light of the codefendant's proposed expert evidence. After the court granted the severance, the State elected to proceed with the Defendant's trial and to schedule the codefendant's trial at a later date. The transcript of the hearing reflects that the defense did not request a continuance upon learning that the Defendant's case would proceed as scheduled for a trial that day. The defense first raised the issue in the motion for a new trial, in which it alleged that the court erred in not granting a continuance "after hearing and granting" the motion to sever the codefendant. The Defendant argued at the hearing on the motion for a new trial and argues on appeal that he did not know "until the morning of trial whether he would be defending against the State . . . only or against his co-defendant as well, which made it impossible for him to prepare adequately for trial, and adversely impacted his ability to receive a fair trial."

We review a trial court's denial of a motion to continue for abuse of discretion. *See State v. Willis*, 496 S.W.3d 653, 744 (Tenn. 2016). In order to obtain relief, a Defendant must show that he was prejudiced from the denial of a continuance. *Id.*

-21-

The record reflects that the trial court granted the Defendant's requested severance relief. The Defendant requested a continuance in the event the court did not grant the severance. He did not request a continuance *as a result of* the court's grant of a severance and the State's election to proceed with the trial of the Defendant and not the codefendant on that date. *See* T.R.A.P. 36(a).

In any event, the Defendant has not shown that he did not receive a fair trial in the absence of a continuance. Although he argues that he did not know until the morning of the trial whether he would have to defend against the State or whether he would have to defend against both the allegations made by the State and the allegations of his misconduct toward the codefendant, the record reflects that the defense did not receive the codefendant's expert report until the week before the trial, and it was on the basis of this report that he made his motion for a severance, and alternatively, for a continuance. The court addressed the basis for his motion for a severance by granting the severance. The Defendant has not articulated any specific basis upon which he was unable to be prepared for the trial, in light of the severance he requested and received. He is not entitled to relief on this basis.

## VI

## Cumulative Error

The Defendant contends that he is entitled to relief based upon cumulative trial errors. The cumulative error doctrine requires relief when "multiple errors [are] committed in the trial proceedings, each of which in isolation constitutes mere harmless error, but which when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial." *State v. Hester*, 324 S.W.3d 1, 76-77 (Tenn. 2010) (internal citations omitted); *see State v. Jordan*, 325 S.W.3d 1, 79 (Tenn. 2010) ("'[T]he combination of multiple errors may necessitate . . . reversal . . . even if individual errors do not require relief.'") (quoting *State v. Cribbs*, 967 S.W.2d 773, 789 (Tenn. 1998)). The Defendant has alleged only a single instance of purported trial error – the denial of the motion for a continuance – which, if credited, might result in the grant of a new trial. The Defendant's remaining allegations pertain to issues which, if credited, would result in the dismissal of a conviction or alteration of some of his sentences. Without multiple instances of trial error to accumulate, the cumulative error doctrine does not apply. Thus, cumulative error relief is not appropriate.

# V

## Sentencing for Attempted First Degree Murder
## and Being a Felon in Possession of a Firearm

As we stated in Section I.B., insufficient evidence exists for application of the Criminal Gang Offenses Statute enhancement to the Defendant's sentences for attempted first degree murder and for being a felon in possession of a firearm. As such, the Defendant's sentences for these offenses must be revisited. The Sentencing Reform Act provides that, upon appeal of a sentence, this court's remedies include remanding the case for resentencing or "affirm[ing], reduc[ing], vacat[ing] or set[ting] aside the sentence imposed." T.C.A. § 40-35-401(c)(2), (3).

Neither party argues that the trial court erred in its sentencing determinations, and the only challenge is to the application of the Criminal Gang Offenses Statute's enhancement provisions. Further, the parties fully litigated the facts and issues relative to sentencing at a hearing, and the record of that hearing is before this court. Thus, we will consider the appropriate sentences based upon the record that is before this court.

At the sentencing hearing, New Tazewell Police Officer Gary Ruszkowski testified that he investigated an April 2016 incident in which the Defendant and two other people went to a home for a drug transaction, that a dispute arose, and that the Defendant shot a bystander who had not been involved in the dispute. Officer Ruszkowski said the Defendant fled in a truck, tossed a firearm out of the truck during his flight, and was later apprehended with two more firearms in his truck. Officer Ruszkowski said the victim suffered serious bodily injury and was taken by helicopter to UT Medical Center. Officer Ruszkowski said the Defendant pleaded guilty to aggravated assault, attempted second degree murder, and unspecified drug offenses as a result of this incident.

Relative to the present case, the victim testified that he had undergone extensive medical treatment and had residual injuries from being shot by the Defendant. The victim said that he needed additional surgery but that he might lose his career as a patrol officer if he underwent the surgery.

Knox County Sheriff's Deputy Debbie Cox testified that the Defendant had received thirteen disciplinary write-ups in the Knox County Jail. She acknowledged that some of the write-ups dated to 2009 but said he had five for the present year and two for the previous year. She said the last major infraction occurred on a date that was about ten days before the sentencing hearing.

The presentence report was received as an exhibit and reflected that the Defendant had a lengthy and abysmal history of criminal convictions which exceed those necessary

to establish his classification as a Range II offender. He had numerous juvenile adjudications dating to age twelve. He had a previous probation violation, and he had disciplinary infractions from prior incarceration in the Department of Correction. The Defendant reported that he had been a member of the Aryan Nation previously, that he had left the gang, and that he would likely return to the gang once he was incarcerated. The Defendant had received a GED and had completed vocational training. He reported poor mental health, excellent physical health, and extensive illegal drug use. He was married and had four children. His Strong-R Risk Assessment Tool scored him as "high for violent [sic]."

Certified copies of three Claiborne County felony convictions reflected that the Defendant had been on probation at the time he committed the present offenses.

A sentencing court must consider any evidence received at the trial and sentencing hearing, the presentence report, the principles of sentencing, counsel's arguments as to sentencing alternatives, the nature and characteristics of the criminal conduct, any mitigating or statutory enhancement factors, statistical information provided by the Administrative Office of the Courts as to sentencing practices for similar offenses in Tennessee, any statement that the defendant made on his own behalf, and the potential for rehabilitation or treatment. *State v. Ashby*, 823 S.W.2d 166, 168 (Tenn. 1991) (citing T.C.A. §§ 40-35-103, -210; *State v. Moss*, 727 S.W.2d 229, 236 (Tenn. 1986); *State v. Taylor*, 744 S.W.2d 919 (Tenn. Crim. App. 1987)); *see* T.C.A. § 40-35-102 (2018).

Likewise, a trial court's application of enhancement and mitigating factors is reviewed for an abuse of discretion with "a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *Bise*, 380 S.W.3d at 706-07. "[A] trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Id*. at 706. "So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed . . . within the appropriate range" will be upheld on appeal. *Id*.

The abuse of discretion with a presumption of reasonableness standard also applies to the imposition of consecutive sentences. *State v. Pollard*, 432 S.W.3d 851, 859 (Tenn. 2013). A trial court has broad discretion in determining whether to impose consecutive service. *Id*. A trial court may impose consecutive sentencing if it finds by a preponderance of the evidence that one criterion is satisfied in Tennessee Code Annotated section 40-35-115(b)(1)-(7) (2018). In determining whether to impose consecutive sentences, though, a trial court must ensure the sentence is "no greater than that deserved for the offense committed" and is "the least severe measure necessary to achieve the purposes for which

the sentence is imposed."  T.C.A. § 40-35-103(2), (4) (2018); *see State v. Desirey*, 909 S.W.2d 20, 33 (Tenn. Crim. App. 1995).

The State argued at the sentencing hearing that the following enhancement factors applied:

(1) The defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range;

(2) The defendant was a leader in the commission of an offense involving two (2) or more criminal actors;

. . . .

(8) The defendant, before trial or sentencing, failed to comply with the conditions of a sentence involving release into the community;

. . . .

(11) The felony resulted in death or serious bodily injury, or involved the threat of death or serious bodily injury, to another person, and the defendant has previously been convicted of a felony that resulted in death or serious bodily injury;

. . . .

(13) At the time the felony was committed, one (1) of the following classifications was applicable to the defendant:

. . . .

(C) Released on probation;

. . . .

(19) If the defendant is convicted of the offense of aggravated assault pursuant to § 39-13-102, the victim of the aggravated assault was a law enforcement officer, firefighter, correctional officer, youth services officer, probation and parole officer, a state registered security guard/officer, an employee of the department of correction or the department of children's services, a uniformed member of the armed forces or national guard, an emergency medical or rescue worker, emergency medical technician or

paramedic, whether compensated or acting as a volunteer; provided, that the victim was performing an official duty and the defendant knew or should have known that the victim was such an officer or employee[.]

T.C.A. § 40-35-114. The defense did not argue that any mitigating factors applied. *See id.* § 40-35-113.

The trial court was heavily swayed by the Defendant's prior criminal history and by his commission of an offense involving a threat of death or serious bodily injury while having a prior felony conviction involving serious bodily injury. *See id.* § 40-35-114(1), (11). The court did not address the remaining enhancement factors proffered by the State, nor did it find the existence of any mitigating factors. The court found that, based upon these enhancement factors and the weight the court placed upon them, the Defendant should receive maximum sentences for each of his convictions, aside from the provisions of the Criminal Gang Offenses Statute providing for a presumptive maximum sentence within the applicable range. *See id.* § 40-35-121(d).

The record supports the trial court's finding that the Defendant's criminal history is extensive. *See id.* § 40-35-114(1). In addition, the record supports the court's determination that his attempted first degree murder conviction involved a threat of death or serious bodily injury, and he had a prior felony conviction involving serious bodily injury relative to the Claiborne County incident and convictions about which Officer Ruszkowski testified, and for which judgments were received as exhibits. *See id.* at (11).

Although not relied upon by the trial court, the record reflects that the Defendant has a prior record of failing to comply with the terms of release, as shown by his prior probation revocation. *See id.* at (8). In addition, the evidence reflects that the Defendant was on probation for the Claiborne County convictions when he committed the present offenses. *See id.* at (13).

For attempted first degree murder, a Class A felony, the Defendant faced a Range II sentence of twenty-five to forty years. We conclude that the Defendant is deserving of a maximum, forty-year sentence based upon the presence of multiple enhancement factors and the absence of mitigating factors.

For the three Class B felony offenses for being a felon in possession of a firearm, the Defendant faced Range II sentences of twelve to twenty years. Again, the facts show that the appropriate sentence is a maximum, twenty-year sentence.

For the Class C felony offense for being a felon in possession of a firearm, the Defendant faced a Range II sentence of six to ten years. We again conclude that the maximum sentence of ten years is appropriate.

As we have stated, the trial court merged the four convictions for being a felon in possession of a firearm into a single judgment of conviction. The court imposed the sentence for this merged judgment to be served concurrently with the sentence for attempted first degree murder. Thus, this component of the Defendant's overall sentence remains at forty years, notwithstanding the inapplicability of the Criminal Gang Offenses Statute enhancement.

As to the remaining convictions, the trial court imposed partially consecutive sentencing based upon its finding that the Defendant was a dangerous offender whose behavior indicated little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high. *See id.* § 40-35-115(b)(4). The record supports the court's determination in this regard, as the Defendant has repeatedly committed violent offenses that involve high risk to the wellbeing of others, and he has repeatedly shown that he will act without hesitation in the commission of dangerous criminal offenses. *See State v. Wilkerson*, 905 S.W.2d 933, 937-39 (Tenn. 1995). As such, the Defendant's effective sentence remains at fifty-eight years based upon the court's partially consecutive alignment of the individual sentences.

Thus, we conclude that the trial court arrived at the appropriate Range II sentence of forty years for Class A felony attempted first degree murder, notwithstanding our determination that the Criminal Gang Offenses Statute does not apply to the Defendant. We modify the Defendant's Range II, Class B felony sentences in Counts 1, 2, and 3 for being a felon in possession of a firearm to twenty years. We modify the Defendant's Range II, Class C felony sentence for being a felon in possession of a firearm in Count 4 to ten years.

In addition, we note that the judgments for attempted first degree murder and being a felon in possession of a firearm denote that each offense is gang related. The amended judgments for Counts 1-4 shall not reflect the gang enhancement, and the trial court shall also modify the judgment for Count 5 to remove this notation.

In consideration of the foregoing and the record as a whole, the judgments of the trial court for Counts 1-14 are affirmed. The jury's factual findings in Counts 15 and 16 relative to the Criminal Gang Offenses Statute are vacated, and these counts are dismissed. The Defendant's sentences in Counts 1-4 are modified as stated in this opinion. The judgments in Counts 1-5 are modified to remove any notation that the offense is designated as a gang offense.

_____
ROBERT H. MONTGOMERY, JR., JUDGE